RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEBI MCKINNEY, on behalf of herself and all others similarly situated,

*Plaintiff-Appellant*,

*v.*

No. 16-3895

CARLTON MANOR NURSING & REHABILITATION CENTER, INC., et al.,

*Defendants*,

SOVRAN MANAGEMENT COMPANY, LLC,

*Defendant-Appellee*.

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cv-00279—Algenon L. Marbley, District Judge.

Argued: August 2, 2017

Decided and Filed: August 18, 2017

Before: SILER, SUTTON, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Samuel Heldman, THE GARDNER FIRM, Washington, D.C., for Appellant. **ON BRIEF:** Samuel Heldman, THE GARDNER FIRM, Washington, D.C., for Appellant. Mary E. Olsen, M. Vance McCrary, THE GARDNER FIRM, Mobile, Alabama, Kenneth R. Cookson, KEGLER BROWN HILL & RITTER, Columbus, Ohio, for Appellant.

---

**OPINION**

---

SUTTON, Circuit Judge.   After the Ohio Department of Health cited Carlton Manor Nursing & Rehabilitation Center for health and safety violations, the nursing home hired Sovran Management Company to help turn things around.  When that did not work, the nursing home closed its doors for good.  Debi McKinney, a former worker at the nursing home, claims that Sovran owes the nursing home's employees back pay under the Worker Adjustment and Retraining Notification Act, which requires "employer[s]" to give their employees 60 days' notice before they "order" the closing of a company.  29 U.S.C. § 2102.  The district court ruled as a matter of law for Sovran.  We affirm.

Most nursing homes seek reimbursement from Medicare or Medicaid for their services. In return, they must comply with federal health and safety regulations.  Both programs represent a form of cooperative federalism, as they are funded by federal and state money and the regulations are enforced by federal and state officials.  In July 2013, the Ohio Department of Health cited Carlton Manor for failing to meet 27 of those regulations.  It ordered the nursing home to come into compliance by January 2014, with the warning that it would lose its status as a Medicare and Medicaid provider if it did not.  The nursing home hired Sovran, a management consultant for nursing homes, to help correct the problems.

By January 2014, the nursing home had resolved 26 of the deficiencies.  Yet the 27th, the physical structure of the building, proved more difficult to fix.  In consultation with Sovran, the nursing home presented the Department with a 12-month plan to repair the building.  That was not enough.  In mid-January, the Department rejected the plan and began the process of revoking the nursing home's operating license.  The nursing home closed soon after.

Carlton Manor gave little notice to its employees about the closure.   In response, McKinney filed this putative class action against the nursing home and Sovran under the Worker Adjustment and Retraining Notification Act, called WARN by those who like acronyms.  The Act requires employers to give employees 60 days' notice before they close a plant.  29 U.S.C.

§ 2102.  Carlton Manor defaulted, and the court entered a judgment against it.  That did not do the employees much good, because the nursing home had no assets for the employees to collect.  That left Sovran, the only solvent defendant in the case.  But that did not help either.  The district court concluded that Sovran was not liable under the Act because the nursing home, not Sovran, was the employer, and the nursing home, not Sovran, decided to close the facility.  As a result, the district court reasoned, Sovran had no obligation to warn the nursing home workers of the closing.  It granted summary judgment for Sovran and thus had no need to rule on McKinney's class certification motion.

This case begins and largely ends with the words of the Act.  Section 2102 says: "An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" on its employees.  29 U.S.C. § 2102.  Section 2104 adds:  "Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for" back pay and benefits.  29 U.S.C. § 2104.

Only "employer[s]" that "order" a plant closing face regulation by the Act or liability under it.  That makes considerable sense.  The purpose of the Act is to encourage employers to give *their* employees notice before closing a company.  The entity in the best position to warn employees about a closing is the employer, who runs the company and who decides to close it.  And the entity from whom the employees will most acutely appreciate any warning about a closing is the employer.  There's no dispute that Carlton Manor, not Sovran, employed these individuals, and Carlton Manor, not Sovran, made the final decision to close the nursing home.  That means Sovran does not fit naturally within the terms of the Act.  *See Administaff Cos. v. Tow*, 337 F.3d 454, 456 (5th Cir. 2003).

Even so, McKinney maintains, the Act's regulations offer two other paths for imposing liability on Sovran—either because Sovran and Carlton Manor were in reality a "single employer" of McKinney or were "separate employers" of McKinney.  Appellant's Br. 11, 15.  The Act's regulations appear to contemplate each theory of liabililty, and no one challenges their validity here.  "Under existing legal rules," they say, "independent contractors and subsidiaries[,] which are wholly or partially owned by a parent company[,] are treated as separate employers or

as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2). "Some of the factors to be considered in making this determination," the regulation adds, "are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." *Id.*

*Single employer.* These considerations do not show that Sovran and Carlton Manor were in truth one entity, as opposed to two. Four of the factors do not remotely show that we should treat Sovran and Carlton Manor as a single employer. There was no common ownership between the two. The management consultant and the nursing home did not share any directors or officers. The two companies kept their payrolls separate and did not share any personnel policies. And no one disputes that Carlton Manor and Sovran operated two distinct businesses that were not dependent on each other. *See In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008) (finding no "dependency of operations" where one company continued to operate without incident after the other folded).

One might argue that the management consultant as a practical matter exercised some "control" over the company in view of the dire straits facing the nursing home. According to one witness, for example, Sovran had authority to fire employees of the nursing home. But it's not clear that this is what "de facto control" means or that it is the kind of thing that would show that the consultant and nursing home amounted to one employer. *See Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006 (9th Cir. 2004) (finding "de facto exercise of control" where management of one company "would ultimately answer to higher management" of the controlling company). The client in this independent contractor relationship remained the nursing home, and Sovran remained the consultant. Either way, the outcome remains the same because the other factors confirm that the two entities remained independent.

But don't rush to judgment, warns McKinney. Even a 0 for 5 tally, or at best a 1 for 5 tally, does not tell the whole story. No one factor listed in the regulation is controlling, she points out, and the statute's remedial purpose should incline us to adopt a "flexible application to specific circumstances as they arise." Appellant's Br. 17–18. To that end, the "overriding" issue

in her view is the "level of control" used by the independent contractor (here Sovran) in helping the employer (here Carlton Manor). *Id.* at 21.

Overriding indeed. It may be true that no one factor in the regulations is dispositive. But that does not help McKinney because she cannot meet any of the listed factors or at best partially meets one of them. It may be true that the itemization of five factors does not prevent us from considering other factors that could show that the two employers were one. But that option still requires an articulation of distinct considerations, and she has not identified anything beyond the listed factors. The abstract possibility of identifying other approaches to this question by itself does not permit us to override the concrete approaches already mentioned.

*Separate employers*. The regulations refer not just to the possibility of treating two nominally distinct entities as one entity but also to the possibility of treating each entity as a distinct employer of the affected individual with independent duties under the Act. There is plenty of overlap between the two concepts, as confirmed by the reality that the regulations list the same five factors in addressing both of them. Just as some factors could unveil the lack of independence between two entities—common ownership, common management, de facto control of one entity over the other—those same factors also might show that the two entities each employed the same individual.

But this potential path to liability does not help McKinney either. As just shown, the regulations' five factors, whether examined singly or taken together, do not show that Sovran was a separate employer of McKinney. The one factor that might operate differently in this setting—"de facto control"—does not change things. There is no evidence that Sovran hired McKinney, fired McKinney, or otherwise treated her as one of its employees. All of the extant evidence shows that Carlton Manor hired McKinney and ultimately fired her when the nursing home closed. And no evidence shows that Sovran "ordered" the closing of the nursing home, as required by the language of the statute.

Trying to avoid this conclusion, McKinney invokes cases in which employees of debt-laden corporations sued their employers' lenders under the Act. *See Coppola v. Bear Stearns & Co.*, 499 F.3d 144 (2d Cir. 2007); *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir.

2001); *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241 (9th Cir. 1995). In those cases, McKinney points out, the courts focused on "the amount of 'control' that the lender exercised over the 'ordinary operations'" of its borrower to determine whether the lender should be liable to the borrower's employees. Appellant's Br. 19. But those cases use the word "control" in the same sense that the regulations use the words "de facto control" here—as a proxy for lack of independence. 20 C.F.R. § 639.3. They recognize that, at least in the lender-borrower context, a lender may exercise such pervasive control over a delinquent borrower's business operations (say by exercising its rights under a loan agreement) that the borrower is no longer "independent" of the lender. *See Coppola*, 499 F.3d at 148, 150 (lender may exercise such control over the borrower as to become the debtor's "agent, partner, or alter ego" or "the de facto owner of an ongoing business"); *Pearson*, 247 F.3d at 478 (the "nature and degree of control possessed by the [lender] over the [borrower]" might make it appropriate to "pierce the veil" under the Act).

Comparison is the thief of happiness, it's sometimes said. But comparisons between cases are all we have in law and are at the heart of most legal disputes. McKinney's comparison hurts rather than helps her cause. A lender-borrower relationship, in which the loan agreement allows the lender to take control of a borrower who cannot repay a loan, offers a poor analogy to a consultant-consultee relationship that is arm's length from beginning to end. Sovran offered management advice to Carlton Manor at the nursing home's behest and did not become the owner of the nursing home in the process. The consulting arrangement allowed the nursing home to ask Sovran to leave at any time. And it allowed the management consultant to leave as well, which is just what it did after helping Carlton Manor make the necessary arrangements to shut down the nursing home.

For these reasons, we affirm.